**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN D. HOPE, | |
| Plaintiff, | |
| v. | No. 18-cv-04402 |
| | Judge John F. Kness |
| FORD MOTOR COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION & ORDER**

Plaintiff John Hope was 53 years old when he was hired as a Team Manager at Defendant Ford Motor Company's Chicago Assembly Plant. After ten months on the job, Plaintiff took a two-month medical leave because of a back injury unrelated to his employment. Plaintiff alleges that, after he returned from leave, his supervisor, Darin McElroy, harassed Plaintiff because McElroy regarded him as being disabled. Plaintiff also alleges that McElroy harassed him because of his age. Plaintiff says the harassment created a hostile work environment that forced him to retire about one and a half years into his tenure.

In this suit, Plaintiff brings two hostile work environment claims, one under the Americans with Disabilities Act and the Age Discrimination in Employment Act. Defendant has moved for summary judgment on both claims. (Dkt. 78.) As explained more fully below, the evidence gathered in discovery and presented in connection with Defendant's motions for summary judgment shows that Plaintiff could not prevail

before a reasonable jury. Accordingly, Defendant's motion for summary judgment is granted.

## I.  FACTUAL BACKGROUND

For over twenty years, Plaintiff worked for Defendant at various production facilities. (Dkt. 92 ¶¶ 6, 73.) On August 1, 2016, Plaintiff began a new position as a Team Manager at Defendant's Chicago Assembly Plant ("CAP"). (*Id.* ¶ 4.) This was a double promotion from Plaintiff's previous position at Defendant's Kentucky Truck Plant, where he worked as a Process Coach supervising hourly employees. (*Id.* ¶ 5.) As a Team Manager in CAP's Chassis Department, Plaintiff was responsible for overseeing other salaried supervisors and the overall "productivity, efficiency, safety, costs, [and] quality" of the assembly line. (*Id.* ¶ 10.) Plaintiff was supervised by Darin McElroy. (*Id.* ¶ 7.) McElroy interviewed Plaintiff for the Team Manager role at CAP and took part in the decision to hire Plaintiff. (*Id.* ¶ 8.)

In 2016, McElroy recognized Plaintiff and his team for "Extraordinary Effort/Performance" in "Production and Efficiency." (*Id.* ¶ 77; Dkt. 102 ¶ 78.) But McElroy began to take issue with Plaintiff's job performance in 2017. McElroy first addressed the performance issues verbally and by email, and as problems persisted, with written Notices of Performance Coaching/Counseling ("NPCC"). (Dkt. 92 ¶ 25.) NPCCs are used to provide feedback and give employees specific direction for improving their performance. (*Id.* ¶ 23.) NPCCs are not sent to Human Resources or placed in the employee's personnel file.[1] (Dkt. 92 ¶ 23.)

---

[1] The parties dispute whether NPCCs constitute "discipline." (Dkt. 92 ¶ 23.) Defendant submits a declaration from James Pipkin, a Human Resources Business Partner, who claims

McElroy issued Plaintiff his first NPCC on February 8, 2017 regarding cost performance of the Chassis Department. (Dkt. 82 at 67.) This was the only NPCC Plaintiff received before going on medical leave for a herniated disc. Beginning on June 6, 2017, Plaintiff began having severe back pain while at home. (Dkt. 92 ¶ 18.) Plaintiff was diagnosed with a herniated disc and hospitalized for three days to treat the pain. (*Id*.) Plaintiff took a two-month medical leave of absence from work to treat the condition through physical therapy. (*Id*. ¶ 19.) On August 1, 2017, Plaintiff returned to work fully healed with no physical restrictions or limitations on his ability to conduct his daily life. (*Id*. ¶ 20.) At his deposition, Plaintiff testified that upon his return to work "I felt like I could work and do my normal job, and I could move regularly." (*Id*.)

After Plaintiff returned from medical leave, McElroy began issuing Plaintiff a litany of NPCCs, often on the same day. For instance, Plaintiff received one NPCC on August 3, 2017 about overmanning (working more employees than necessary) (Dkt. 93-1 at 2); six NPCCs on October 8, 2017 related to overmanning, end of shift procedures, failure to document coaching or counseling of subordinates, overtime spend, and unresolved machinery repairs (*Id*. at 4–10); one NPCC on October 16, 2017 about overmanning (*Id*. at 11); two NPCCs on November 14, 2017 regarding overmanning and failure to arrange staffing coverage during scheduled vacations (*Id*.

---

that NPCCs are "not discipline" (Dkt. 82 at 3), while Plaintiff maintains that NPCCs are discipline because they "can ultimately lead to [a Performance Enhancement Plan] program which could lead to suspension and up to termination" (Dkt. 92 ¶ 23). Whether NPCCs constitute official "discipline," however, is not relevant to Defendant's motion for summary judgment.

at 12–14); three NPCCs on November 30, 2017 related to production loss, overmanning, and unresolved machinery repairs (*Id.* at 15–19); two NPCCs on January 8, 2018 about overmanning and inventory management (*Id.* at 20–21); and three NPCCs on January 25, 2018 about overmanning, inventory management, and production loss (*Id.* at 22–25).

McElroy also routinely told Plaintiff that he was "not engaged" in his work, meaning that he was "not focused on the job at hand . . . [and] on what [Plaintiff] need[s] to do." (Dkt. 92 ¶ 38.) McElroy considered Plaintiff to be the poorest performing Team Manager in the Chassis Department. (*Id.* ¶ 41.) Plaintiff was rated a "Lower Achiever" in his 2017 year-end performance review. (*Id.* ¶ 46.) This rating was determined by a group of managers Plaintiff regularly interacted with, not just McElroy. (*Id.*) Plaintiff, however, was never placed on a performance enhancement plan ("PEP") during his tenure with Defendant. (*Id.* ¶ 24.) Under Defendant's rules, an employee with serious performance issues may be placed on a PEP, which sets specific, measurable goals that the employee must meet in the short term. (*Id.*)

Plaintiff, in turn, had issues with McElroy's management style. Plaintiff disagreed with the way McElroy ran his department, saying that McElroy "would micromanage the heck out of you," which was "not [Plaintiff's] style." (Dkt. 92 ¶ 47.) McElroy would also raise his voice at times and yelled at Plaintiff and other members of the team. (*Id.* ¶ 48.) Plaintiff considered McElroy's communication style to be "harsh," "aggressive," and "unprofessional." (*Id.* ¶¶ 48–49.) Plaintiff's coworker, Charles Givens, also recalls McElroy raising his voice at employees on multiple

occasions. (*Id.* ¶ 48.) As did Plaintiff, Givens found McElroy's communication style to be "harsh" and "derogatory" and thought that McElroy's "people skills were terrible." (*Id.* ¶ 49.)

Plaintiff eventually complained to Human Resources regarding an incident that occurred on November 27, 2017, when McElroy was "screaming and yelling at everybody" in Plaintiff's area because an assembly line was down at the start of the shift. (*Id.* ¶ 53.) On January 22, 2018, Human Resources Associate, Gina Allmon-Smith, interviewed Plaintiff about the incident. (*Id.* ¶ 57.) Allmon-Smith also interviewed McElroy and several of the employees he supervised. (*Id.*) But before Human Resources could complete their investigation, Plaintiff submitted notice that he intended to retire. (*Id.* ¶ 59.) Plaintiff's last day of work at CAP was February 8, 2018. (*Id.* ¶ 60.) Plaintiff was 55 years old when he retired. (*Id.*) Human Resources later concluded the investigation and found that McElroy had not violated company policy, but HR counseled McElroy to refrain from using harsh or offensive language in the future. (*Id.* ¶ 58.)

Around the time Plaintiff complained to Human Resources, Plaintiff also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff alleged that he had been "harassed and disciplined" after returning from medical leave on August 1, 2017; discriminated against because of his disability and in retaliation for engaging in protected activity; and discriminated against because of his age. (Dkt. 1 at 8.) The EEOC was "unable to conclude" that

Defendant committed any violations and issued Plaintiff a right to sue letter on April 13, 2018. (*Id.* at 10.)

Plaintiff then filed this suit and asserts two counts in his Amended Complaint: age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and disability discrimination under the Americans with Disabilities Act ("ADA"), 49 U.S.C. § 12101 *et seq.* (Dkt. 31.) Plaintiff alleges that McElroy created a hostile work environment by making comments about Plaintiff's age and repeatedly disciplining Plaintiff because of his perceived disability from his herniated disc. (*Id.*) This hostile work environment, Plaintiff alleges, forced him to retire. (*Id.* ¶ 23.) Defendant seeks summary judgment on both claims. (Dkt. 78.)

In opposing summary judgment, Plaintiff argues that McElroy perceived Plaintiff as being disabled when he returned from medical leave on August 1, 2017 and created a hostile work environment using NPCCs. (Dkt. 91 at 11.) Plaintiff highlights that he received only one NPCC in the ten months he worked under McElroy before going on medical leave but received 18 NPCCs in less than seven months after his return to work. (*Id.* at 2; Dkt. 93-1 at 2–25.) On multiple occasions, McElroy issued Plaintiff more than one NPCC on the same day, which Plaintiff criticizes because Plaintiff, when supervising his own subordinates, "never gave any employee more than one [NPCC] per day." (*Id.* at 1.) Plaintiff also says that the NPCCs were often unwarranted. (*Id.* at 2, 4–11.) Plaintiff further alleges that McElroy forged Plaintiff's signature on his 2017 mid-year performance review and an assembly line performance report. (*Id.* at 3, 13.) Finally, Plaintiff contends that once

6

per week, McElroy called Plaintiff "punch drunk" because Plaintiff "walked with a slight limp when [he] returned to work after [his] back injury." (*Id.* at 11.)

Plaintiff also identifies several comments made by McElroy about Plaintiff's age. During Plaintiff's Team Manager interview in 2016, McElroy apparently said "Damn how old is he" after Plaintiff detailed his lengthy employment history with Defendant. (Dkt. 91 at 12.) McElroy also requested Plaintiff's photo, which is supposedly an "unprecedented" request during an interview. (*Id.*) In addition, Plaintiff was often told that he was "too old" for the job, and that "McElroy stated this more than three times in 2016, more than once a month in 2017, and more than seven times in 2018." (*Id.* at 12–13.) Plaintiff finally notes that he was replaced by Jennifer Mayfield, who was under 40 years old, after he retired. (*Id.* at 13.)

## II.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of

material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.   DISCUSSION

### A.   ADA Claim

To establish a claim for hostile work environment based on disability, a plaintiff must prove "(1) they were subject to unwelcome harassment; (2) the harassment was based on their disability; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018)).

Defendant contends that summary judgment should be granted in its favor on Plaintiff's ADA hostile work environment claim for three reasons: (1) Defendant never regarded Plaintiff as disabled, so there could not have been any harassment based on a perception of disability; (2) but assuming Defendant regarded Plaintiff as disabled, Plaintiff was not harassed based on his perceived disability; and (3) the harassment was neither severe nor pervasive. (Dkt. 79 at 5.)

In opposing summary judgment, Plaintiff does not respond directly to Defendant's arguments for summary judgment on the ADA hostile work environment claim. Instead, Plaintiff recasts his allegations as if he were bringing a discrete act of

discrimination claim and sets out to prove his claim under the "indirect method" using the *McDonnell Douglas* burden-shifting framework.[2] (Dkt. 91 at 14–19.) Defendant counters that Plaintiff's tactic is impermissible because Plaintiff is attempting to amend the complaint with a new theory of liability through his brief in opposition to summary judgment. (Dkt. 101 at 10–11.)

Generally, a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). A plaintiff, however, is "not required to plead its legal theories." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). District courts should therefore allow plaintiffs to "proceed on new legal theories [during summary judgment] as long as the factual basis has already been plead, and as long as the new theory does not unfairly harm the defendant by causing unfair cost, delay, or surprise." *N.C. ex rel. Spraggins v. Brown*, 2019 WL 4749978, at *4 (N.D. Ill. Sept. 30, 2019) (citing *Chessie*, 867 F.3d at 859). If the plaintiff alters the complaint's factual theory when opposing summary judgment, "the district court has discretion to deny the *de facto* amendment and refuse to consider the new factual claims." *Chessie*, 867 F.3d at 860.

Throughout this case—including especially during discovery—Plaintiff has proceeded solely on the theory that Defendant created a hostile work environment.

---

[2] A plaintiff can prove a discrete act of discrimination "either by presenting evidence of discrimination (the 'direct method' of proof), or by the *McDonnell Douglas* burden-shifting approach (the 'indirect method')." *Darchak v. City of Chicago Bd. Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) (quoting *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009)). Plaintiff limits his arguments to the *McDonnell Douglas* burden-shifting approach (indirect method).

Plaintiff alleges in the Amended Complaint that, after he returned from medical leave, he endured a "very stressful, hostile environment for months, which was due to Defendant's perception of Plaintiff's disability." (Dkt. 31 ¶ 23.) Moreover, in opposing Defendant's earlier-filed motion to dismiss, Plaintiff asserted only that the Amended Complaint "established a claim of a hostile work environment based on his perceived disability." (Dkt. 43 at 4.)

Plaintiff's summary judgment response brief, however, appears to attempt to shoehorn his hostile work environment allegations within the *McDonnell Douglas* framework used for assessing discrete acts of discrimination (Dkt. 14 at 14–19), a distinct legal theory under the ADA. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (distinguishing hostile work environment claims that are based on repeated conduct from discrete act claims that are based on specific, adverse employment actions such as termination); *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (applying *McDonnell Douglas* to denial of promotion because of age). For instance, Plaintiff argues that the NPCCs, forgeries, and punch-drunk comments establish a prima facie case of disability discrimination and that Plaintiff's performance issues were pretextual (Dkt. 14 at 14–19)—arguments relevant to the first and third steps of the *McDonnell Douglas* framework. *Tyburski*, 964 F.3d at 598.

It may thus be that Plaintiff is asserting a new legal theory for the first time in his brief opposing summary judgment.[3] But the Court does not consider Plaintiff's

---

[3] It may also be that Plaintiff is mistakenly blending two distinct doctrines: hostile work environment and discrete acts of discrimination. For instance, Plaintiff's brief addresses the first and third steps of the *McDonnell Douglas* framework and cites to Seventh Circuit cases discussing the standard at each step when analyzing discrete acts of discrimination. (Dkt. 91

new theory because the factual basis for a discrete act claim is not apparent from the Amended Complaint. To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Plaintiff is required to show that he "belonged to a protected class, met [his] employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class who were treated better." *Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 956 (N.D. Ill. 2016). Plaintiff's Amended Complaint, along with his Rule 56 statement of additional facts, do not show that he met Defendant's expectations or that similarly situated, non-disabled employees were treated more favorably. (*See generally* Dkt. 31 ¶¶ 15–24; Dkt. 92 ¶¶ 73–103.) Plaintiff's discrete act theory would require a de facto amendment of the complaint.

Considering Plaintiff's discrete act theory at this stage would also cause unfair delay, surprise, and expense to Defendant. Plaintiff has throughout this case proceeded solely on his hostile work environment theory. Defendant tailored its discovery strategy, including Plaintiff's deposition, to this theory and focused specifically on the alleged instances of workplace harassment. Defendant, however, did not get the chance to develop facts that could be used to defend against a discrete act claim, such as disproving whether a similarly situated employee exists. Plaintiff's late invocation (in a summary judgment reply brief) of his discrete act theory "looks

---

at 14–19 (citing *Wright v. Ill. Dep't of Corr.*, 204 F.3d 727, 730 (7th Cir. 2000) and *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).) But Plaintiff's brief does not discuss any discrete act of discrimination (such as a termination or demotion) and instead exclusively discusses the facts alleged in his complaint—mainly, NPCCs—which he contends establish a hostile work environment. (*Id.*)

like a straight ambush" of Defendant when it is "too late" to "put together a comprehensive rebuttal." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482 (7th Cir. 2019). In addition, discovery has already closed, meaning that "both parties had already invested a good deal of time and money in the case on the legitimate expectation that they knew what the issues were." *Id.* A party responsible for the tardy claim—here, Plaintiff—should not be allowed to "raise[] the cost of litigation" to Defendant's detriment. *Id.* Accordingly, the Court will only consider Plaintiff's originally pleaded hostile work environment theory.

### 1. Plaintiff was Not "Regarded As" Disabled Because he had a "Transitory and Minor" Impairment.

Under the ADA, discrimination in employment based on a disability is prohibited. *Ford*, 942 F.3d at 850. "Disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff proceeds solely on the theory that Defendant regarded Plaintiff as disabled. (Dkt. 31 ¶¶ 17, 23 ("Plaintiff's perceived disability" was his herniated disc, and Defendant created a hostile work environment "due to Defendant's perception of Plaintiff's disability."); Dkt. 43 at 4 ("Plaintiff asserts that Defendant perceived that his herniated disc . . . was a disability."); Dkt. 91 at 14–17 ("Defendant perceived [Plaintiff] to have a disability.").)

A plaintiff cannot be "regarded as" having a disability if his impairment was "transitory and minor." 42 U.S.C. § 12102(3)(B); *Baier v. Rohr-Mont Motors, Inc.*, 2013 WL 2384269, at *6 (N.D. Ill. May 29, 2013) (Contention that an impairment was

"transitory and minor" is "a defense to an ADA claim under the 'regarded as' prong."). To establish this defense, the defendant must show that the plaintiff's impairment is objectively both "minor" *and* "transitory." 29 C.F.R. § 1630.15(f.)

Defendant contends that Plaintiff's herniated disc was a "transitory and minor" impairment. (Dkt. 79 at 5.) Plaintiff fails to respond to Defendant's argument (*see generally* Dkt. 91 at 14–17), meaning Plaintiff has waived any argument in opposition, and summary judgment may be granted for Defendant on this basis alone. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) (Plaintiffs waived their claims by "failing to respond in any way" to arguments advanced by defendants in support of summary judgment.); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466–67 (7th Cir. 2010) (Court must accept defendant's arguments, supported by "pertinent legal authority," because of plaintiff's failure to respond.). But the undisputed facts also establish that Plaintiff's condition was "transitory and minor."

A "transitory" impairment under the ADA is "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Plaintiff testified at his deposition that he was "fully healed" and had no restrictions when he returned from medical leave on August 1, 2017, fewer than two months after Plaintiff's impairment from the herniated disc began on June 6, 2017. Plaintiff, in opposing summary judgment, now asserts that "I walked with a slight limp when I returned to work after my back injury." (Dkt. 91 at 16.) Plaintiff's allegation, however, is contradicted by his previous deposition testimony where Plaintiff said he "was

healed," "had no restrictions on physical ability" or in his "daily life," and "could move regularly." (Dkt. 93-3 at 56.) Plaintiff cannot "create an issue of material fact by submitting an affidavit that contradicts an earlier deposition." *Pourghoraishi v. Flying J. Inc.*, 449 F.3d 751, 759 (7th Cir. 2006). Consequently, Plaintiff's impairment ceased when he returned to work after almost two months on leave, meaning the impairment was "transitory" because its actual duration was less than six months.

The ADA does not define what constitutes a "minor" impairment. *Id.* Similarly, the Seventh Circuit has addressed this issue only once and held that a heart condition requiring a triple bypass surgery was not minor. *See Silk v. Bd. of Trustees, Moraine Valley Community College, Dist. No. 524*, 795 F.3d 698, 706–07 (7th Cir. 2015). Other circuits have likewise concluded that a "surgery on a vital organ" is not minor. *See, e.g.*, *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 249 (3d Cir. 2020) (distinguishing invasive thoracic surgery from a minor, though painful, impairment such as a broken pinky finger). District courts, however, have held that back injuries treatable with non-invasive interventions (such as physical therapy) are minor. *See, e.g.*, *Quick v. City of Fort Wayne*, 2016 WL 5394457, at *3 (N.D. Ind. Sept. 27, 2016); *Wilson v. Graybar Elec. Co.*, 2019 WL 1229778, at *12, 14–15 (E.D. Pa. Mar. 15, 2019); *Roebuck v. Am. Axle & Mfg.*, 2012 WL 6151988, at *4 (W.D. Mich. Dec. 11, 2012). *Quick* is particularly persuasive because the injury, symptoms, and treatment were almost identical to Plaintiff's. *Quick*'s plaintiff suffered a herniated disc that caused "excruciating pain" and required a trip to the emergency room, but the plaintiff was "100% better" after a month of physical therapy. *Quick*, 2016 WL 5394457, at *3.

14

Although the plaintiff's pain was acute, the impairment was minor because he made a "swift and complete recovery." *Id.* Likewise, Plaintiff's herniated disc here caused "severe" and "excruciating" pain requiring three days in the hospital, but Plaintiff fully healed and returned to work without restriction after undergoing two months of physical therapy. (Dkt. 92 ¶¶ 18–20, 76.) Accordingly, Plaintiff had a "minor" condition.

Because Plaintiff's herniated disc was "transitory and minor," no reasonable jury could find that Defendant "regarded" Plaintiff as disabled.[4] Defendant is therefore entitled to summary judgment on Plaintiff's ADA claim.[5]

---

[4] Because Plaintiff's impairment was "transitory and minor," meaning Plaintiff is not "disabled," 42 U.S.C. § 12102(1), Plaintiff's discrete act of discrimination theory would fail on the merits had the Court considered it. Plaintiff is not disabled, so he is not a member of a protected class, a requirement for establishing a prima face case under the *McDonnell Douglas* framework.

[5] Defendant also argues that Plaintiff's "regarded as" ADA claim fails because there is no evidence that any of Defendant's employees, including McElroy, were "even aware of Plaintiff's injury or the reason he took a leave of absence from Ford." (Dkt. 79 at 5.) There is, however, a genuine dispute on this material fact. In a declaration, McElroy says that "I was aware Mr. Hope took a medical leave in 2017, but I was not aware of the reason he was on leave or the nature of the medical condition that required leave." (Dkt. 82 ¶ 19.) Plaintiff's deposition and affidavit tell a different story. Plaintiff testified that he called McElroy from the hospital to tell him he would be out on medical leave and that McElroy "knew exactly why I was out." (Dkt. 93-3 at 55.) Plaintiff also claims in his affidavit that he "called and talked to Mr. McElroy between June 6, 2017 and June 9, 2017; and told him I was going on medical leave and the reason why and how I was rushed to the hospital by emergency ambulance due to a herniated disc." (Dkt. 93 ¶ 38.) Plaintiff's deposition testimony and affidavit are not inconsistent. *See Pourghoraishi*, 449 F.3d at 759. Moreover, a self-serving affidavit may preclude summary judgment if the evidence presented is based on personal knowledge. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Plaintiff has personal knowledge of his own communications with McElroy. Accordingly, a genuine factual dispute exists regarding whether McElroy knew the reason for Plaintiff's leave. But because Plaintiff's impairment was "transitory and minor," summary judgment for Defendant is still warranted.

### 2. Plaintiff was Not Harassed Based on his Disability.

Even if Plaintiff was regarded as disabled, Defendant contends that Plaintiff was not harassed "based on" Defendant's perception of Plaintiff's disability. (Dkt. 79 at 7–8.) To establish a hostile work environment claim, Plaintiff must prove that he was harassed "based on disability." *Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008). Not "every perceived unfairness in the workplace may be ascribed to discriminatory motivation" just because the plaintiff is disabled. *See Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863 (7th Cir. 2005). Any alleged harassment must be "sufficiently connected" to the plaintiff's disability before it may "reasonably be construed as being motivated by the defendant's hostility" to the plaintiff's disability. *Id.* at 863–64.

Plaintiff argues that McElroy harassed him based on his perceived disability because (1) McElroy issued Plaintiff an excessive number of NPCCs, and the NPCCs were occasionally based on false information or unfairly directed at Plaintiff; (2) McElroy forged Plaintiff's signature on a mid-year performance review and assembly line performance report; and (3) McElroy "at least once a week" called Plaintiff "punch drunk" because Plaintiff "walked with a slight limp" when he returned from leave.[6] (Dkt. 91 at 14–17.)

---

[6] Despite Plaintiff's assertions to the contrary, the only evidence that McElroy made the punch-drunk remarks is Plaintiff's deposition testimony and affidavit. Plaintiff claims his coworker, Charles Givens, overheard the punch-drunk comments and submitted a signed statement attesting to that fact. (Dkt. 92 ¶ 102; Dkt. 93 ¶ 37.) Plaintiff, however, does not cite nor include Givens's signed statement in the summary judgment record. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) (Because voluminous materials are produced during discovery, district courts "are not required to scour every inch of the record."). Defendant produced a declaration from Givens in which Givens declares that he

To begin, the NPCCs are not "sufficiently connected" to Plaintiff's perceived disability. *Beamon*, 411 F.3d at 863–64. On the contrary, they document specific performance related issues, such as overmanning and inventory management. Plaintiff disagrees with McElroy's criticisms, but "a critical (even an unfairly critical) performance review" does not necessarily indicate disability-based harassment. *Id.* at 864.

Nor does the volume of NPCCs suggest discriminatory intent. By Plaintiff's own admission, McElroy was a micromanager. (Dkt. 92 ¶ 47.) Charles Givens shared Plaintiff's criticisms but did "not think that Mr. McElroy singled [Plaintiff] out" and that "Mr. McElroy used the same management style with everyone." (Dkt. 82 at 78.) McElroy's general inclination to micromanage through NPCCs does not establish that Plaintiff was harassed based on his disability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713–14 (7th Cir. 2004) (general management style not evidence of discriminatory motive); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004) (accusations of gender-based discrimination fail because defendants were "crude individuals who treated everyone poorly"). Moreover, Plaintiff complains that McElroy issued Plaintiff multiple NPCCs on the same day. But Givens, who is not disabled, also received multiple NPCCs on the same day (Dkt. 92 ¶ 79), which undermines Plaintiff's contention of disability-based harassment.

---

"did [not] hear anyone ever talk about [Plaintiff's] medical condition at CAP." (Dkt. 82 at 78.) That said, Plaintiff's contentions alone, made from personal knowledge, are sufficient to create an issue of fact on whether McElroy called Plaintiff punch drunk. *Payne*, 337 F.3d at 773.

Plaintiff's allegations that McElroy forged his signature on a mid-year performance review and assembly line performance report also lack sufficient connection to Plaintiff's disability. The allegations, even if true, show only that McElroy behaved inappropriately and perhaps contrary to company policy. Plaintiff, however, alleges no facts showing that McElroy committed the forgeries to harass Plaintiff because of his disability.[7]

Only one allegation has an arguable connection to Plaintiff's disability: that McElroy called Plaintiff "punch drunk." According to Plaintiff, McElroy made the comment because of Plaintiff's limp. (Dkt. 91 at 16.) But as previously explained, the Court must disregard Plaintiff's contention that he limped after returning from medical leave because Plaintiff previously testified that he was "fully healed" and "could move regularly." (Dkt. 92 ¶ 20.) McElroy's punch-drunk comment thus could not be referring to Plaintiff's nonexistent limp. Even if Plaintiff limped, however, Plaintiff's contention that McElroy was referring to his limp as opposed to his mental acuity is mere speculation.[8] *See Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999)

---

[7] Although the NPCCs and forgeries are neutral with respect to Plaintiff's disability, this alleged harassment could still "contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). The "other evidence," however, must be "sufficiently intertwined" with the plaintiff's protected class to infer animus from status-neutral harassment. *Id.* at 896–97 (Placement of a noose and sign reading "No blacks allowed past this point" does "not support a reasonable inference that most of the hostility [plaintiff] encountered was connected to his race.") For the reasons explained below, the only other alleged harassment—the "punch drunk" comments—is not "sufficiently intertwined" with Plaintiff's disability to permit an inference that the NPCCs and forgeries were also motivated by animus towards Plaintiff's disability.

[8] Defendant also argues that McElroy did not know the reason Plaintiff was on medical leave, so the punch-drunk comment could not possibly have been in reference to Plaintiff's disability. (Dkt. 79 at 8.) As previously discussed, there is a genuine dispute regarding

(Assertions based on "speculation or conjecture" shall not be considered on summary judgment.); *Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841 (7th Cir. 1996) (The "subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact.").

Plaintiff's own definition of punch drunk is ambiguous regarding whether the term refers to a physical or mental impairment. Plaintiff, in his opposition to Defendant's earlier filed motion to dismiss, defined punch drunk as "confused and unable to speak or move normally because of being punched so many times in the head . . . unable to think or act normally because you are very tired, excited, etc."[9] (Dkt. 43 at 5.) Plaintiff again provided an ambiguous definition at his deposition, testifying that punch drunk means, "Somebody that is inadequate with doing anything. In their head they're not mobile, they're not able to function, weakness in their legs." (Dkt. 93-3 at 71.) Plaintiff admitted that McElroy could have been referring to "My physical being" or my "behavior too." (*Id.* at 73.) McElroy is the only individual with personal knowledge that can clarify the ambiguity. When Plaintiff asked McElroy what he meant by punch drunk, McElroy said "you walk around like

---

whether McElroy knew the reason why Plaintiff took medical leave. Accordingly, the Court cannot disregard the punch-drunk statement based on McElroy's lack of knowledge regarding Plaintiff's disability.

[9] The Court notes that Merriam Webster dictionary defines punch drunk as "suffering from mental confusion." *Punch Drunk*, Merriam Webster Dictionary, https://www.merriam-webster.com/thesaurus/punch-drunk. Merriam Webster also lists "dazed" and "confused" as synonyms. *Id.* This definition and the accompanying synonyms refer solely to mental impairment.

you're punch drunk. You don't know what the hell is going on," apparently referring to Plaintiff's mental awareness. (*Id.* at 72.)

Plaintiff's subjective hunch that McElroy was referring to Plaintiff's limp, asserted for the first time in his affidavit opposing summary judgment, is insufficient to create a genuine issue of fact. *Mills*, 83 F.3d at 841 (Plaintiff cannot prevent summary judgment by speculating that the supervisor, who said that he was "out to get rid of [Plaintiff]," intended to do so because of Plaintiff's age.); *Johnston v. DeVries*, 2021 WL 3930298, at *2 (N.D. Ill. Sept. 2, 2021) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue the demolition of which is a primary goal of summary judgment.") (citation omitted). Because Plaintiff's speculation does not establish harassment "based on" his disability, Defendant is again entitled to summary judgment on Plaintiff's ADA claim.

### 3. Plaintiff's Harassment was Not Severe or Pervasive.

Defendant contends that the harassment identified by Plaintiff was neither severe nor pervasive. To establish a hostile work environment, a plaintiff must prove that "the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment." *Ford*, 942 F.3d at 856. Courts look to several factors in assessing whether a hostile work environment existed, such as "the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007).

Plaintiff did not respond to Defendant's argument that the disability-based harassment suffered by Plaintiff was not severe nor pervasive. Plaintiff thus has waived any argument in opposition, and the Court may grant Defendant summary judgment based on the lack of evidence on this element. *Citizens for Appropriate Rural Roads*, 815 F.3d at 1078. Independent of that factor, however, the disability-based harassment suffered by Plaintiff was neither severe nor pervasive.

As explained above, the NPCCs, forgeries, and punch-drunk remarks were not based on Plaintiff's disability, but instead on McElroy's controlling and aggressive management style. *Lillie v. Chartwells*, 2007 WL 951900, at *8 (N.D. Ill. Mar. 26, 2007) ("Courts have held that a supervisor can criticize and micromanage a subordinate and it will not be actionable absent evidence of discriminatory animus."). At best, the punch-drunk statements were the only incidents arguably related to disability—and even those were too infrequent and innocuous to establish a hostile work environment.

Plaintiff claims that McElroy called him punch drunk every week. (Dkt. 91 at 14–17.) But Plaintiff testified at his deposition that McElroy called him punch drunk only three times. (Dkt. 93-3 at 73 ("Q: And how many times did [McElroy] use that term punch drunk to describe you? A: Several times. So probably about three. Q: Okay. A: Three times.").) If "deposition and affidavit testimony conflict, the deposition will trump the affidavit unless the statement in the deposition is demonstrated to be mistaken." *Mach Mold Inc. v. Clover Assocs., Inc.*, 383 F. Supp. 2d 1015, 1025 (N.D. Ill. 2005) It is thus undisputed that McElroy called Plaintiff punch drunk three times.

21

Three mildly insulting remarks over the course of Plaintiff's approximately one-and-a-half-year tenure is neither severe nor pervasive enough to show a hostile work environment. *See Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("A handful of comments spread over months is unlikely" to create a hostile work environment.); *McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038 (N.D. Ill. 2017) (Comments made to plaintiff diagnosed with tinnitus, including asking why plaintiff cared about volume of the phone when she did not "hear anything half the time anyways" and slamming the table or laughing when plaintiff asked people to repeat themselves, was not severe or pervasive.) For this independent reason, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

### B.     ADEA Claim

Under the ADEA, workers "40 years of age and older" are protected "from age-based employment discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). As the Seventh Circuit has assumed (but never decided), plaintiffs may bring hostile work environment claims under the ADEA. *See Tyburski*, 964 F.3d at 600. To do so, a plaintiff must show that "(1) she was subject to harassment; (2) the harassment was based on her age; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Id.* at 601. Although the Court assumes that Plaintiff may bring an ADEA hostile work environment claim, Defendant is nevertheless entitled to summary judgment because the alleged harassment was not severe or pervasive.

In opposing summary judgment, Plaintiff highlights the following age-related harassment: during Plaintiff's interview for the Team Manager position, McElroy said "Damn how old is he" after Plaintiff detailed his lengthy employment history with Defendant; McElroy requested Plaintiff's photo during the interview, which was "unprecedented"; McElroy often told Plaintiff that he was "too old" for the job, including "more than three times in 2016, more than once a month in 2017, and more than seven times in 2018"; and Defendant replaced Plaintiff after he retired with someone under 40 years old. (Dkt. 91 at 12–13.)

Defendant argues that Plaintiff's allegation that McElroy often called Plaintiff "too old" is contradicted by Plaintiff's deposition testimony. (Dkt. 101 at 13.) Plaintiff was asked at his deposition to detail all age-related comments made by McElroy during his tenure at CAP. Plaintiff recounted two incidents: (1) McElroy said "this is not the '90s, the pace is fast now"; and (2) McElroy reacted sarcastically when Plaintiff said he tells people that he's only 49. (Dkt. 93-3 at 62–63.) When Plaintiff was subsequently asked whether McElroy made any other comments about his age, he responded "No. Other than asking me about my age more than once." (*Id.* at 63.) Because Plaintiff said "no" when asked whether there were other instances of age-based comments, Plaintiff's reference to being asked about his "age more than once" must refer to the two post-meeting incidents that Plaintiff had just described. Because Plaintiff's allegation that McElroy consistently called him "too old" is contradicted by his testimony that McElroy made only two age-related comments, the Court disregards this allegation. *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020)

(Every "federal court of appeals permits a judge to disregard . . . an affidavit that contradicts prior deposition testimony.").

These two instances, in conjunction with the remaining allegations, do not establish a hostile work environment. As an initial matter, the Court is skeptical that McElroy harassed Plaintiff because of his age. An inference of nondiscrimination exists in age discrimination cases "when the plaintiff is already over 40 when hired and the same person does the hiring and firing." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1065 n.4 (7th Cir. 2008). This inference "has the most bite where a relatively short time span separates the [hiring and firing]" because it is "unlikely that a decisionmaker developed an aversion to older people" in that time. *Id.* (cleaned up). It is doubtful that McElroy, who hired Plaintiff when he was 53 (Dkt. 92 ¶¶ 4, 60), harassed Plaintiff because of his age during Plaintiff's less than two-year tenure at CAP. *See Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000) (two years between hiring and firing creates inference that defendant did not discriminate based on age); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) (same).

In any event, the harassment was not severe or pervasive. To be "severe or pervasive enough to create a hostile work environment, conduct must be extreme." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 918, 625 (7th Cir. 2018). Offhand remarks or stray comments "generally do not rise to the level of a hostile work environment." *Aguilera v. Village of Hazel Crest*, 234 F. Supp. 2d 840, 848 (N.D. Ill. 2002). In *Tyburski*, for example, the Seventh Circuit held that nine age-related comments over

24

the course of four years made by two of the plaintiff's coworkers was not severe or pervasive harassment. 964 F.3d at 602. These comments included "you [are] too old. You cannot keep up with me"; you are "f\*\*king old" and do "not know what [you] are doing"; and "you are old and you [are a] piece of s\*\*t." *Id.* at 595. Moreover, in *Racicot v. Wal-Mart Stores, Inc.*, regular comments by two of plaintiff's coworkers that plaintiff "shouldn't be working at her age" and if plaintiff "were younger, [plaintiff] could pick up boxes when heavy shipments arrived" was not severe or pervasive harassment. 414 F.3d 675, 676–78 (7th Cir. 2005).

In Plaintiff's approximately year-and-a-half tenure at CAP, McElroy once said "Damn how old is he," requested a photo, and made two "sarcastic comments" about Plaintiff's age after team meetings.[10] (Dkt 93-3 at 62–63.) These regrettable stray remarks and occurrences, devoid of any of the vitriolic profanity present in *Tyburski*, do not rise to the level of severe or pervasive harassment necessary for establishing a hostile work environment claim. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADEA claim.

---

[10] That Plaintiff was replaced by someone under 40 years old after Plaintiff retired is of no moment to Plaintiff's hostile work environment claim. What matters is whether the harassment "was sufficiently severe or pervasive so as to alter the conditions of [Plaintiff's] employment." *Tyburski*, 964 F.3d at 601. Once Plaintiff retired, he could no longer suffer any further harassment from Defendant, nor could Plaintiff's conditions of employment be altered.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 78) is granted.[11]

SO ORDERED in No. 18-cv-04402.

Date: March 22, 2023

_____

JOHN F. KNESS
United States District Judge

---

[11] Plaintiff seeks damages in the form of "back pay" and "future pay" because Defendant's harassment allegedly forced him to resign. (Dkt. 31 ¶¶ 15, 24.) Defendant argues that Plaintiff is not entitled to such damages because Plaintiff (1) failed to exhaust his administrative remedies by not including an allegation of "forced" retirement in his EEOC charge; and (2) not claiming that he was constructively discharged. (Dkt 79 at 14–15.) Because summary judgment is granted for Defendant on all claims, the Court does not address Defendant's additional arguments related to damages.